to the Court of Appeals for the Sixth Circuit. If you are counsel for the appellant and wish to reserve some time for rebuttal, please so indicate to me and also to our court officer. With that, you may call the first case. 132500141120, United States of America v. Tommy Kilpatrick and Bobby Ferguson, arguments not to exceed 20 minutes for each appellant, 40 minutes for the appellee, Mr. Gurwitch, Ms. Van Dusen for appellant. Good afternoon. Good afternoon, Your Honor. I wish to reserve five minutes for my oral argument. In this case, the defendants have 20 minutes of oral argument and the United States has 40 minutes. So everyone understands. Okay. All right. You may proceed. Thank you very much. Now, the first issue of the two that I wish to address this afternoon concerns conflict of interest. There was a serious adverse interest conflict which pervaded the trial from the proceedings that began in April of 2012, eight months before the trial for all of the proceedings. It existed because Mr. Thomas and Mr. Naughton, who were the primary attorneys for Mr. Kilpatrick, became up counsel to the O'Reilly law firm that was concurrently, simultaneously suing Mr. Kilpatrick based upon exactly, identically the same allegations that were in the indictment. They had attached, the civil law firm had attached the indictment as an exhibit to their complaint. Did these two lawyers partake into it, participate to a great extent or just happen to be in the same firm? They were up counsel to the firm, Your Honor. Right. But the question was, did they participate actively or they're just in the firm, period? The record that was established by the court does not provide any evidence of the extent to which they participated, except for the limited description related to this particular case. Otherwise, Judge Edmonds, making inquiry on August 14, 2012, before the trial actually started, did not inquire to determine what the nature of the details of the relationship in fact were at that time. The only information was provided in Mr. Thomas' brief to the court that indicated that in connection with this particular case, that there was, that Mr. Thomas and Mr. Naughton maintained separate files in their office in downtown Detroit. Do you have any evidence to the contrary? Do I have any evidence that that wasn't true? No, Your Honor. Didn't they say that there was a wall between the firm and the two of them regarding this matter? They did, in connection with this matter. It is our position, however, that the nature of this conflict was one that went to the entire relationship between Mr. Thomas and Mr. Naughton in the firm. The government has relied upon the case of Hempstead v. New York. In that case, the court found that there was an attenuated relationship. However, there was inquiry by the judge in that case about exactly what the relationship was of the attorney to the law firm with which he was of counsel. That didn't occur here. Do you, just so that we're all on the same page, I don't think there's any question that this would have violated Michigan rules, but do you agree that we are governed here by the federal constitutional requirements? Yes. Okay. I do. Does there have to be an actual conflict under the federal law? I differ with that. The Mickens case establishes that there is a framework that is to be used to evaluate conflicts of interest, defined by three primary cases, including Holloway, Tyler v. Sullivan, and Wood v. Georgia. Those cases represent a range of types of relationships that the attorneys had there, which formed conflicts of interest that were examined by the courts in different ways. In Holloway, which is in fact the closest to the situation that we have, the attorney who complained was appointed to represent three individual defendants who went to trial together and protested, as in effect happened here, where Judge Edmonds did take a look at this conflict. The court, in reviewing this circumstance, said that there were really two problems. One was the nature of the relationship that the attorney in Holloway had to his clients. He had three of them at trial. And two was the fact that the judge, although he had notice of the conflict, really did nothing. There were some inquiries, according to the record and the opinion by the court. That's a different situation when you have a joint representation of co-defendants at the same trial. I mean, that's much different than we're talking here, is it not? It is different, Your Honor. I believe that if one were to... It's different in our case law, right? Well, I think this court, this case, to use a Latin phrase, is sui generis. There is not another one reported that has the circumstance where the primary attorneys representing a defendant in a serious case, which gathered a great deal of public attention, was at the same time part of the firm that was advocating the opposite position. In a joint defendant trial where one attorney is representing both defendants, that's a situation where prejudice is presumed because you cannot represent conflicting interests in the same trial. Here, you're imputing the bias or the conflict because these two attorneys are of counsel to the firm that has a civil action against the client. I mean, it's different. I want to ask you, it seems to me that the government is arguing in the brief at page 35 that the standard that we should apply here is a modified Strickland standard, that a violation of the Michigan rules of professional conduct alone does not establish a violation of the Sixth Amendment. The violation of the Sixth Amendment is really what you have to prove here. The government says a defense attorney's conflict of interest can in some circumstances violate a defendant's Sixth Amendment right to counsel, but there are no per se conflicts, only actual conflicts. To demonstrate an actual conflict, the defendant must establish both that his counsel actively represented conflicting interests and two, the alleged conflict adversely affected his lawyer's performance. Do you agree with that standard or not? I agree, Your Honor, that that is a standard that was articulated first in Tyler v. Sullivan. You agree that that's what we should apply in this case? No, I do not. Okay, why not? I do not because of the nature of this conflict, number one. Number two, because there was a protest. There was, the matter was brought to the attention of the trial court, inquiry was made, and there was not, as this court said in McFarland v. Eukins, there was not a sound resolution of this problem that was raised. The problem is more serious than it was in either Kyler, Wood, or in Mickens. All cases that were reviewed on habeas corpus or indirect review, Wood was at its own particular circumstances, but this is a case where this came to the court's attention at trial after the issue was raised. In the other cases, where that standard... Are you saying that Judge Edmunds should have sui sponte, had an evidentiary hearing? Not sui sponte. The matter was raised on August 13th when she was advised of this conflict. Kilpatrick wanted to present evidence at the hearing and was denied an opportunity to present evidence? That didn't occur. It may well have been... No, I didn't see that as an issue in the case, that Judge Edmunds committed reversible error in denying a request for an evidentiary hearing. Is that what you're arguing here today? No, it's not that I'm arguing that she denied a request. Well then you're just saying she should have sui sponte on her own, held an evidentiary  She did conduct a hearing. Mr. Kilpatrick... She had a hearing, but you're saying she should have had an evidentiary hearing? She should have taken more evidence than she did. She accepted the representations of counsel on brief. She accepted a statement by Mr. Kilpatrick at length about a separate conflict that had been raised regarding prior representation of a witness. However, she did not make any further inquiry of the nature of the relationship that Mr. Thomas and Mr. Naughton had. She didn't ask Mr. Kilpatrick if he understood that there was this conflict situation and asked him if he weighed that or if he was prepared to proceed. Counsel failed... Did he weigh that earlier in connection with the civil lawsuit? Mr. Thomas brought his up-counsel relationship to the attention of Judge Cleland in the civil case in March of 2012 to support a request to withdraw up in representation of Mr. Kilpatrick at that time. The court ruled that he could withdraw. He was ordered that he did withdraw because withdrawal was mandated in the parallel civil case because of that conflict of interest. That withdrawal was in the civil case, not the criminal case. That's right, Your Honor. Judge Cleland didn't have jurisdiction over the criminal case, right? He did not. There was no notice. Oh, so Mr. Kilpatrick was not aware of those proceedings? There is no record that is part of the criminal case that he was aware of those proceedings. Now, he picked these two lawyers out himself, did he not? Well, the record indicates that Mr. Thomas had represented Mr. Kilpatrick since 2008 and at the request of Mr. Kilpatrick, Mr. Thomas was appointed to represent him at the beginning of the criminal case. So he picked them out. That's true. This conflict then arose at the time that Mr. Thomas, for some reason, before this trial began, decided to become off-counsel to this firm suing his client. There was no mention of this particular circumstance of the off-counsel relationship until August 13th in response to the judge's specific request to the attorneys to notify the court of any and all conflicts, including the one that had been reported in the Detroit Free Press on the day that she sent out an email asking for the information. That's the first time this appears in the court record anywhere. Okay, but are you saying Mr. Kilpatrick did not know why his counsel withdrew in the civil action? What was it, four months earlier? I mean, four months earlier he withdrew because of this conflict. Are you just saying that he's uninformed of the reason? I mean, it's his attorney. The motion to withdraw was originally filed before Judge Kalilin based upon a breakdown in the relationship. But it was amended to include, or notified, this is March 21st, 2012, that they notified the court of an additional reason to withdraw, that they were becoming of counsel to the O'Reilly firm. Are you saying that Mr. Kilpatrick just didn't pay any attention to it, or what? Because it looks to me like he has notice that his counsel are becoming of counsel to O'Reilly in March of 21. When this matter was brought to Judge Edmund's attention on August 13th and then at the hearing that took place on August 14th, there was no inquiry to Mr. Kilpatrick about whether or not he received notice of that, Your Honor. The record is void about the nature of the relationship that those two attorneys had to the O'Reilly firm and whether or not Mr. Kilpatrick was ever aware of it. They were at that time using the email address of the law firm, which they said that they didn't, they were separated from, as their own email address. I believe that the cases that I have brought to the court's attention, I recognize that some of these arise in the civil context, make plain that the nature of this kind of an adverse relationship is never countenanced under the rules of professional conduct in Michigan. It's one that the court had an obligation to investigate further. According to Holloway and according to McFarland, the same principles apply and that didn't occur here. Even if I agree with you, I've got to find reversible error under Sixth Amendment law, though, right? It is my position that as framed in Holloway, this is the kind of error that goes to the heart of the integrity of the justice system. Holloway describes this as a structural error, much like is the case in Gideon, in Gonzales-Lopez, we haven't cited, where the court spoke about the right of an attorney to retain counsel. In the Young case, decided by the Supreme Court, involving a circumstance where a plaintiff's attorney in a civil contempt action was appointed to prosecute the opposing party in the case. These are fundamental kinds of problems and that's what Holloway describes this to be. You're focusing on the failure to make further inquiry, as I hear your argument. What is the remedy? Is the remedy to start all over or to remand for the inquiry that should have been... Let's say there had been an inquiry and the inquiry supported that they maintained completely different offices, had nothing to do with the case, were vigilant about the ethical barrier. What would have happened at that point? Well, if the court could have determined that, then there would have been some problem with the fact that they represented themselves to be at counsel. And I think there would be some question about what they had represented to Judge Cleland in order to withdraw. The Michigan Supreme Court, through the rules of the Michigan Bar, have said that not counsel relationship must be close, personal, and regular. Those are the kind of things that create the conflict and those are the things about which there should have been inquiry in this case. The district court appointed another lawyer to get into this case for that purpose, right? That's right. Where it involved somebody who might have been on the other side. I'm sorry? They appointed another lawyer to be in the case to cross-examine one of the persons that might have had some connection with these two lawyers, right? That's right, and that was me. Yeah, okay. So you came in at that time. I did for the limited purpose, according to the record, on September 15, 2012, and the court's order indicated that the extent of the appointment by which I became part of the case was limited to the so-called inland conflict. The conflict, if the court would have examined the complaint in the civil case, would have been apparent, would have extended to the same breadth as the allegations in the Rico case. It wasn't just about inland. It was about all of the allegations of extortion that were part of the complaint. That is what the plaintiffs in the O'Reilly case were pursuing in the civil case. That is exactly what they intended to continue to pursue, even after Judge Cleland granted summary judgment in October and they asked for certification of that issue so it could be appealed to this court. He ruled against the plaintiff in that case, not against your client. In the civil case? How did the criminal case start? The criminal trial started in September. The judge in the civil case ruled in October. Effectively, that didn't come to an end until February, the same time the criminal case was coming to a close. So I'd just like an answer to the question. I'm not sure that I heard one. So if the judge had done what she should have done, you say, which is to pursue the matter, to inquire, if hypothetically the testimony established that there was a true division, would we be here today? That, as I said, I think that there couldn't have been a division because the conflict that's won under the Michigan rules is governed by Rule 1.7. There was an adverse relationship. But we know that the Michigan rules were likely violated. But for constitutional purposes, what would that have established with regard to satisfy the constitutional standard for an unconstitutional conflict? It would have established the standard which the court used in Holloway, which the court in, Justice Scalia in Mickens affirmed, still continues as part of the framework, which should be used by courts to look at the range of type of relationships that fall within the general description of conflict to determine whether or not, what action is required to be taken. In Holloway, the court said that the action must be taken is to reverse the conviction. There, the court didn't look to see whether or not there was an effect upon relationship because it said, we cannot countenance that type of a circumstance in the court proceedings. And that's the outcome which I think should be followed here. You're out of time unless you want to use your rebuttal now. No. All right. We recognize you have other issues in your brief and that you will rely on those issues in your brief that you haven't waived them today because you're right on time. Okay. Thank you very much. Let's hear from counsel for defendant Ferguson. Good afternoon. May it please this honorable court, Susan Van Dusen appearing on behalf of Bobby Ferguson. Your honors, I wish to reserve five minutes for rebuttal. I want to direct my attention to the issue of whether the district court erred in admitting testimony by the case agents which was not properly limited, lay opinion testimony under federal rule of evidence 701 and this testimony should have been excluded. Your honors, in the course of the investigation into this matter, the government obtained just shy of 370,000 text messages. Of these 370,000 text messages, 151 were introduced in evidence at the trial. To understand the issue that we present to the court today, these text messages were introduced through the two case agents, agent Carol Paskevich and FBI special agent Robert Beckman. There are two pleadings filed by the government which absolutely set the stage for understanding where we would contend we end up today. The first pleading is the government's motion in limine for pretrial determination of admissibility of certain evidence. That's found at the record, it's document 92. In their motion, the government stated that the agents may provide some lay opinion testimony pursuant to rule 701 about the meaning of particular text messages. And in making that statement, the government relied on the three very cases which this court in United States v. Freeman decided, as I know the court is familiar, in September of 2013, it rejected those cases. The government based its representation to Judge Edmonds on the admissibility of their intended lay opinion testimony on three cases which were subsequently rejected. If I may, and I quote, we want to provide context for specific text messages that may otherwise be confusing to the jury. Now, the government did note, because it dropped a footnote there, the Sixth Circuit has not decided yet whether agents may give lay opinions regarding the meaning of criminal conversations based on their knowledge of a particular investigation. That issue is currently pending before the Sixth Circuit in United States v. Freeman. Did Freeman come out to the public before the trial started? No, sir. This motion filed by the government was in May of 2012. The next motion and response that I'm going to reference was in June. Our trial started and we actually started with jury selection on September 6th of 2012 and the trial concluded with the jury's verdict in March of 2013. Freeman, of course, as I mentioned and your Honor well knows, came down in September of 2013. So it came down later? It did, sir. It did. Your Honor, I would submit the government took a risk. They made a guess that the cases they were relying on, that they requested the district court to rely on and indeed which the district court did rely on, those cases didn't hold up. They didn't hold up then. We argued at that time and cited the very cases from the circuits that held that such lay opinion testimony went beyond that which is allowed under Rule 701. What was the most egregious error that happened in regard to these summary witnesses? Just the worst thing that you can think of that happened. There must be one bad one that you think is the worst. You know, I have so many to pick from, Your Honor, but I actually did bring with me a small sampling and the best way to describe what happened at this trial was when the case of United States v. Albert Talley listed the dangers that are inherent when an agent is testifying in this regard and you need to understand that out of all of this, these agents were called to the stand 24 times. You're not saying that that's against the rules, are you? I am not saying it is against the rules. I am certainly familiar with repeated testimony, but what I am saying is that the government utilized these agents for a reason. The reason that they appeared 24 separate occasions was they tied the whole case together. They summarized. They opined. They interpreted. They discussed text messages that were clear on their face. It was in point of fact, when I think about this case, I am reminded and was reminded during that trial in which I was one of the trial counsel for Mr. Ferguson, I felt like I was witnessing Thornton Wilder's play, Our Town, where you have the stage manager who assumes a role, inserting him into what Wilder wanted the audience to draw in terms of interpretation, in terms of linking things together which did not necessarily apparently belong together, clearly invading the jury's province, making reference to items which very well could be hearsay were never presented to this jury. Repeatedly, the prosecutor began his questioning of each agent on each of the 24 times, and I might add, these questions were objected to. Some of these protracted trials would have a stopping point and then let the prosecutor summarize in his argument and then let defense counsel summarize, you're saying that's what they should have done instead of putting the agent back on? No, I'm not in any way advocating... That's happened and that's approved, you know, you understand that, of course. I'm not advocating that we have a little mini-closing arguments during the... That's sort of what happened, right, through the witnesses? The government was allowed to repeatedly present its theory of prosecution through its two case agents, and one of the things that happened, which just... Before you move on, did we ever get an answer to Judge Seiler's question, what is the worst thing that came out by these agents' testimonies? And I didn't seem to... If you answered that, I didn't write it down. What is the worst thing that came out? If I might, I would like to go to... I actually have some of the transcript with me. If your honors would permit me, I would like to invite your attention to certain things that... Just answer the question, what's the worst testimony that came out? That was the question. The worst testimony that came out would be the repeated reference to the government's theory of prosecution. For example... Okay, the worst thing that came out is they repeated the government's theory. Is that a reversible error? I mean, that doesn't sound that egregious to me. The prosecutor in the closing argument is going to repeat his theory over and over and over again, and to have a lay witness repeat a theory, okay, that's the worst you've got. Your honor, first of all, I would respectfully submit that that is not appropriate lay opinion testimony under Rule 701. Secondly, that is... You've got to establish it's reversible error, that we reverse a six-month jury trial, that this is so egregious that the defendants are denied their constitutional right to a fair trial. That's what you have to convince us. I'm getting a little bit confused. Is the problem that they should have been treated as expert witnesses, or is the problem that they were testifying to conclusions that were not supported by the voluminous record of text messages, or was the problem, which is related to the first one, that they were drawing inferences that there simply was no basis to draw? I mean, I'm not sure exactly what the specific problem is. Your honor, it was all three. Primarily, they were drawing conclusions, they were repeatedly answering questions put to them by the prosecutor that would say, based on your review of the records, based on your review of all the text messages, and if, in fact, they had been qualified as experts, and that, in many instances, was our objection during their testimony, when they would testify with regard to very specific contractual regulations within the city of Detroit, vis-a-vis the Water and Sewer Department, we would object and state that that was expert testimony. It came in anyway. I certainly want to point out, as this Court is familiar, that the Court in Freeman considered about whether or not, if, in fact, this agent had been qualified as an expert, and determined that this agent had not been qualified as an expert, exactly what occurred here. What I am saying is that not only did these agents constantly draw interpretations, but the government used them to recount the testimony of earlier witnesses. The advantage they had, because, of course, as the case agents, they sat at counsel tables. But that was admissible at the time, previously, right? It was. From a witness who says, this happened. And then they just went back over it. It was just cumulative, is what you're saying. They used it to completely set up each of the chapters that they described how the trial was going to be presented to the jury. Isn't that helpful and of assistance to the jury? I mean, 701 says that laypersons may give opinion evidence if it's rationally based upon their perception, helpful to the understanding of the testimony, and not based upon scientific knowledge or specialty. I mean, doesn't 701 cover exactly what you told me the problem is with their testimony, that it's helpful, that it puts it together, that it assists the jury? And that's allowed, isn't it? Your Honor, I would respectfully disagree and recite this court's holding in Freeman. I think Freeman is factually distinguishable from this case, and I'm not sure that it applies just because of that basis. What are you relying on from Freeman? And I quote, Here, the prosecution did not establish a proper foundation for the agent's testimony under Rule 701. As several circuits have recognized, there is a risk when an agent provides interpretations of recorded conversations based on his knowledge of the entire investigation, that he is testifying based upon information not before the jury, including hearsay, or at the least, that the jury could think he has knowledge beyond what is before them. So it would seem to me that, and I think that is a danger. In this case, all of the text messages were introduced, right? 151 of the 370,000. But the government, in posing its questions to the agents, made it clear that they were basing their answers on the 370,000. So you have all of this hearsay, everything that is not in front of the jury and the agent. That's a different objection, that it's not opinion evidence, that it's facts not in evidence. Yes, sir. Which is different, which I didn't see you arguing in this case. When I cited the dangers inherent in this kind of lay opinion testimony as found in Albert Kelley, that's one of them. I thought your objection was that they rendered opinion outside of 701. It is all of those things, including getting into, via 701, all of these areas where it's not permissible. And that is why I felt like the listing of the dangers in the Albert Kelley case was so prescient in terms of pointing out where these kinds of mistakes and this abuse, you can't use 701 as a door and then it's a bait and switch. That's what I believe happened here. And this relates to just Siler's question and perhaps you can bring it up on your rebuttal. Can you tell us or give us an example of the kind of testimony or specific testimony that came in from these two case agents where they drew inferences that were not supported by the rest of the information that came in? So where they're sort of saying, oh, this means this to the jury. This word, which doesn't mean this, that's apparent, that you would know, I know it means this because of everything I know about the case. So if you could give us some examples, I think it would be very useful so that we can know what the impermissible testimony was. And I'm sure Judge Griffin will let you do that. I think it probably is more efficient for me to pull that out. You'll have your five-minute rebuttal. Yes, thank you very much. Thank you. All right, let's hear from the government. Good afternoon. Good afternoon. May it please the Court, Andrew Goetz for the United States. Kilpatrick cannot show that his attorneys of counsel affiliation with O'Reilly Rensselaer adversely affected his representation in any way, that his attorneys did or did not do something at his expense to help O'Reilly Rensselaer's client in that separate civil case. He had an opportunity to do so in his opening brief. He didn't do it there. He didn't do it in his reply brief. He didn't do it in his supplemental brief. He didn't do it here at argument today. That basic point forecloses his argument on appeal. What's the best case that you have to show that that's what we do in deciding this case instead of just saying it's a per se violation? Mickens, Your Honor. In Mickens, the Court was unambiguous that the rule that defense counsel wants to apply here today only applies to cases involving the joint representation of co-defendants. We've quoted the language in our brief, and we recently quoted it, I think, again in the 28-J letter. It's on page 168. It says, Holloway thus creates an automatic reversal rule only where defense counsel is forced to represent co-defendants over his timely objection unless the trial court has determined that there is no conflict. So in Mickens, the Supreme Court limited the rule that the defense counsel is asking you to apply today to cases involving the joint representation of co-defendants, one attorney representing two defendants. This case does not involve one attorney representing two defendants. In fact, quite the opposite. Each defendant had multiple attorneys representing only that defendant. What's your best case of something similar to this, a factual situation, or is there one? Our best case is actually probably the one factually that we just submitted to the Court in our 28-J letter, and it's a case that defense counsel raised in this reply brief and was actually overturned on this very ground. It's a case out of the Eighth Circuit called Coast v. Dormier. It's a case where the defendant had filed a claim against a public defender from his previous case. That claim was still pending against that public defender, while in the meantime a public defender from that same office was representing the defendant in the case of Barr. So you have what defense counsel would characterize as a concurrent conflict, and you have a defendant who objected, and you have the Eighth Circuit, before Mickens, applying the Holloway Rule in the very same way the defense counsel asked his court to apply it now. But then, after Mickens, the Supreme Court GBR'd that case, it came back to the Eighth Circuit, and it applied the actual conflict standard. The Eighth Circuit applied the actual conflict standard and rejected the defendant's argument that the Holloway Rule should apply there. And notably, if you look at defense counsel's briefs, you won't find any case applying the Holloway Rule to any conflict other than joint representation of co-defendants. Courts of Appeal, since Mickens, have taken the Supreme Court at their word. Well, do you... Okay, you can have automatic reversal, and that doesn't apply here, but we also have to inquire into whether there's a genuine conflict. And as I understand it, if there is an actual conflict, then prejudice will be presumed. So looking to the actual conflict, how do we know if we don't know what the relationship was between the lawyers and the firm? And pursuing that, what did Judge Edmonds know about that relationship that supported her ruling? There are a couple answers to your question. I'll get to Judge Edmonds' inquiry first. Judge Edmonds, when she saw the Free Press article describing this conflict, asked the defense attorney to submit a brief. In that brief, the defense attorney, Jim Thomas and Mike Naughton, described how they had set up an ethical wall between their work on the criminal case and O'Reilly Rensselaer's work on the civil case. That ethical wall included things like files being kept at separate offices, separate computer systems, no confidential information exchanged, no financial connection between the criminal case and the civil case. So Jim Thomas, I think, represented in that brief that he had, quote-unquote, no financial connection whatsoever with the civil case. And then O'Reilly Rensselaer represented in the civil case that actually it was even broader than that, the lack of a financial conflict, or lack of a potential financial conflict, because Jim Thomas didn't share any profits in the firm generally. They only shared money on specific cases on which they worked together. So you have a case that looks very much like a referral arrangement, not like the up-counsel relationships described in those advisory ethics opinions. So after Judge Edmonds ordered that briefing, and after Jim Thomas submitted the brief I just described, Judge Edmonds also inquired on the record of Jim Thomas, and this is at the August 14th hearing, inquired on the record about the extent of the alleged conflict, about the extent of the relationship with O'Reilly Rensselaer. Well, the defense counsel just said that Judge Edmonds did not inquire. That is simply wrong. If the court looks at the August 14th transcript, the court will see Judge Edmonds asking defense counsel, asking Jim Thomas, about the precautions they had taken to avoid any confidential information flowing one way or the other, and the financial connection, the lack of a financial connection between Jim Thomas and that civil case. Was there any evidence to the contrary or statements to the contrary by any person in the courtroom? No, there were not. Was there any request to probe those answers? Was there cross-examination? Was there a request for a hearing, anything? No, no request for a hearing. So Patrick actually personally never even made a complaint about this up-counsel relationship. If you look at that August 14th hearing, he focused on the Gaspar Fiore issue, which we resolved by dismissing that count in its entirety. So this was only between Judge Edmonds and Jim Thomas. And it's unclear whether defense counsel is asking for an evidentiary hearing here. I know of no authority requiring that type of full evidentiary hearing. In fact, most cases, the representation of the lawyer as an officer of the court suffices, and that is exactly what happened here. Getting to the second part, I think, of your question, Judge Edmonds, or excuse me, Judge White. Once Judge Edmonds made that inquiry, determined that there was no conflict, decided to appoint independent counsel as an additional precaution, and then the case proceeded to trial and verdict and now an appeal, this case is governed by the actual conflict standard. This is not an attorney grievance commission hearing. This is not a civil case. This is a defendant who is claiming a violation of his Sixth Amendment right to counsel. To show that, he has to show an actual conflict, which is a term of art that means a conflict with an adverse effect on his representation. He has not done that. If you look at his briefs, the only attempt he even makes are cryptic references to Derek Miller's testimony. I think he hints at one point that Derek Miller should have been asked about the formal approval process for CS 1368, which is the sewer lining contract involving inland waters, that Miller should have been asked that it was only the city council's approval that was left and not Kilpatrick's approval, sort of implying that Kilpatrick couldn't possibly have been involved because he wasn't part of the formal approval process. The problem with that argument is that it's very apparent why Jim Thomas didn't ask that question. It's because Thomas and Bobby Ferguson's attorneys split up the cross-examination of each witness. If the court looks at page ID 15031, the court will see that the defense counsel, at the beginning of trial, agreed to divide up the cross-examination. So they did not duplicate cross-examination in a six-month trial and turn a six-month trial into an eight-month trial. That is what happened here. Derek Miller was cross-examined by Jim Thomas on items pertaining to Kwame Kilpatrick alone, bribes from Carl Cato, bribes from John Rutherford, the Civic Fund, things that only pertained to Kwame Kilpatrick. Then Bobby Ferguson's attorney stepped up and he cross-examined Derek Miller on the contract, contracts that overlapped between Bobby Ferguson and Kwame Kilpatrick. And notably, if the court looks at page ID 12646249, Bobby Ferguson's attorney actually did ask Derek Miller's questions on this exact topic that Kilpatrick is now claiming Jim Thomas should have. So not only do we know that the lack of a question here wasn't causally connected to the conflict, we actually know what it was causally connected to. It was causally connected to the decision to divide up cross-examination. Moreover, even if this court were to assume that Jim Thomas should have asked that question personally, that isn't enough. Kilpatrick has to show that the failure to ask that question somehow benefited O'Reilly Rensselaer's client in that other case. He has not done that. Finally, on this conflict issue, I will correct one thing from defense counsel's argument. The record does show that Kwame Kilpatrick was aware of his attorney's withdrawal in the civil case. If you look at Judge Edmunds' order denying Kilpatrick's motion for new trial, she actually points out that in the record, Kilpatrick was served with his attorney's motion to withdraw and the order by Judge Clearland allowing his attorneys to withdraw. So he did know, and he knew four months before this came up here, and he didn't say anything. Was there an indication that he knew why? Yes. Yes, actually. The order granting Thomas' and Naughton's motion to withdraw in the civil case was actually quite specific on that point. If there are no further questions on the conflict issue, I'll move to the agent testimony issue. The defendants have swept up a lot of agent testimony in their briefs trying to invoke this court's decision in Freeman. The problem they have, however, is that much of this testimony is admissible for reasons that have nothing to do with Freeman, and any remaining testimony does not implicate the concerns that this court expressed in Freeman or was, at worst, harmless error in the context of this 90-witness trial. The testimony they've cited includes a variety of things. It includes background, where Agent Paskovich talked about why she became involved in the case, why she began investigating the case. That has long been admissible testimony in the circuit. It included publishing exhibits. Things as basic as publishing exhibits are included in their bullet points. That's admissible. This court recently issued a decision in Tragus holding that that was admissible. Other things, omissions from records. This court held, as far back as 1979, that attorneys could ask agents questions about omissions from records because that's the only way to introduce that evidence. If you have 100,000 documents and you say, in reviewing those documents, did you ever see evidence of X, if the answer to that is no, the only way to introduce that evidence is by asking that question. And so this court held in Scales a couple of decades ago that that was an appropriate line of questioning. That had to do with whether the mayor had ever emailed somebody about the contracts or something of that nature, right? That's correct, Judge Seiler. There were a couple of questions along those lines, and that's what we're invoking this Scales case for. Second, defense counsel makes some hay in their brief about the fact that some of these identifications were based on the agent's review of text messages that weren't in the record. Well, the main reason that happened is because the defendants conceded that that was an appropriate foundation. If you look at the sites we've put in our brief, 1314 through 15, and page ID 7380 to 83, and especially that last site, 7380 to 83, you'll see that on the transcript, defense counsel agreed that review of text messages could qualify as a sufficient foundation. And not only that, they actually agreed that one of the identifications that they've raised in their brief on appeal, that specific identification, was appropriate. So they agreed that it was fine in the district court, and now on appeal at changed course. In her argument today, defense counsel could not answer the question when this court asked her to specify the most egregious examples of testimony. I don't know which one she will bring up on rebuttal. Well, were there objections that there was no basis in the record to draw these inferences? I'm not sure specifically where you're referring to, Judge White. Well, you have the agents testify that what they're reading means a certain thing, and telling the jury that this is what this means. And then general question, what are you basing that on? Well, everything I've learned about the case. So were there any objections that that's too vague, what these inferences are not supported by anything that is in evidence? There were a couple of places, I think, where the agent's testimony veered towards what you're suggesting. It's not as widespread as the defendants have claimed. It came up once or twice. Usually in context, it was clear that they were referring to text messages, recorded phone calls, other admissible documents, things that the defendants had claimed were an appropriate foundation, things that, had the defendants not agreed to that, would have drawn out the trial. Again, another two or three months, if instead of testifying that a defendant's nickname is X, the government introduced 20, 30 text messages to prove that same point, that doesn't help anyone. That's why the defendants agreed it was appropriate. That's why the government did those identifications in the way they did. And that's why this court should affirm it unassailable. So you're saying that all of these, all such translations, inferences from what was on the text, either had already been stipulated to by the defendants or were clearly supported by the record. I don't want to go that, I'm not going that far, Your Honor. I don't want to say they stipulated to each identification because that's not what we're arguing, that's not what happened. We're saying they stipulated to the type of foundation they are now challenging on appeal, whether the agent's review of the text messages or phone calls by itself could be sufficient for an identification. So it's a more general stipulation. They did stipulate to one specific identification, but they didn't stipulate to all of them. So I want to make sure I clear up that misimpression because our argument doesn't go that far. Okay, and can you tell me where the colloquy is that shows that they stipulated to this type of foundation? Sure, it was the last site I gave, 7380283. 7380283. You'll see a debate about this very issue, and the defense attorney who was chosen to speak up for the defense team on this issue said that he did not have a problem with agents reviewing text messages and seeing that they referred to each other by a specific nickname and then testifying that that is the nickname in the text message. And actually he referenced a very specific one, this guy, which was the way Kwame Kilpatrick and Bernard Kilpatrick referred to each other by this guy. He actually referenced that specific one, which of course they're now challenging on appeal. A couple of remaining points. They are, the defense is probably correct that in the government's pretrial pleadings, the rationale went a little bit beyond what Freeman later declined to adopt. They're not actually correct about the cases that the government cites. Freeman did not reject those. Freeman just said that those presented, I think, quote, unquote, different circumstances. So Freeman distinguished those in the facts, not in the law. But regardless of what the government said in its pretrial motion, what matters is the testimony that came out at trial. And the defendants have not pointed to anything material to any of these charges. The pieces of testimony they point to are things like background, context. They don't involve contested elements of the case. And they don't involve contested elements of the case in a case where the evidence was overwhelming. They even try to reverse counts where there was no testimony. Counts that occurred after the text messages stopped. CM 2014, for instance, occurred later. The Oakwood Pump Station occurred later. Occurred after the text messages stopped. Yet they're trying to get those reversed based on agent interpretations of text messages. And if this evidence really was as overwhelmingly prejudicial as defense counsel is going to get up and say, well, the jury's verdict would have come out a little bit differently. Because a couple of pieces that they mentioned and that they raised in their brief deal with phone calls related to Bernard Kilpatrick's count, the RICO conspiracy count on which there wasn't a conviction. Those are the two book Cadillac calls. They deal with the government's theory against Bernard Kilpatrick. And yet, regardless of the agent's testimony there, the jury did not convict Bernard Kilpatrick of that count. He's not sitting here at counsel table. He actually already finished serving his sentence. So if these were really as prejudicial as defendants claim, that count would have come out differently. I am happy to answer any further questions on either issue. On the hearsay, the other hearsay, there's a lot of testimony that was introduced going to state of mind and things like that. And I've gone through it, and I would say that half of it is not admissible. Because it's somebody's testifying to what somebody else said, but that person's giving an account. It wasn't a statement of a state of mind. My question is directed to, after looking at it, though, it also seems that most of that testimony was repeated by the actual person. And I want to know whether that's your understanding. For instance, is it correct that, I think it is, that both Suave and, is it McMahon, McCann, they both testified to these things, right? That's correct, Your Honor. And is it, how about Mr. Parker's testimony? In Mr. Parker's testimony, there was no one else who testified to that. There was, however, the sequence of events, even if you exclude the reaction by Walbridge's executives, and we don't think you should, we do think that is admissible under Williamston Collins, but even if you were to exclude that, you have the general fact that he relayed that to Walbridge, then you have the fact that DWSD, Mercado, and Miller delayed the response to the bid protest, which would have told Walbridge they won the contract, and then you have the fact that the next day, Walbridge enters into this one-page, handwritten contract with Bobby Ferguson, that contract that does not require him to post a bond for $10 million of the work, not to beat a dead horse, but a handwritten contract for $12.7 million just does not happen when it's on the level. And so even if this court were to exclude that testimony and hold that it was improperly admitted, it would be at most harmless error. Is that really something that should be summarized by the prosecution and not put in evidence if you don't have a corroboration by the person to say, I feared to do this because I'd lose my contract? See what I'm saying? I'm not sure I do, Judge Styler. Well, isn't it more appropriate for the prosecution to summarize that rather than have a witness come in and say, so-and-so told me this to show that the second witness was in fear of losing his contract? If you don't have the witness there, if you have the witness there, it's no problem. No, Judge Styler, and I think this gets to the first part of your question, Judge White. The testimony from percipient witnesses who were being extorted at the time that they were in fear is circumstantial evidence of their state of mind. We had to prove, as an element of the charges, fear of economic harm. One of the best ways to do that is contemporaneous statements by the people who are being extorted, something like, I mean, the simplest would be, I feared the defendant, but it could also be, oh, no, what are we going to do? That's not being introduced for the truth of the matter asserted. That's being introduced to show what that person was thinking. That's fine. That's fine. That is admissible. But someone else saying to somebody maybe a month later, well, why the heck did you do that? Oh, I was afraid not getting the contract. That's not, that's hearsay. That's pure hearsay. If that were what had happened, Judge White, I think I'd agree with you. I'm not actually sure that any of that testimony is what they're challenging or happened here. But you're right, if that were what happened, that would violate, I think, the prohibition in 803. And a lot of Suave's testimony about what did McCann tell you was hearsay. And a lot of her testimony about what did he come back and tell her was hearsay. But as I said, I mean, if they both testified to it independently, one has to wonder what harm it did. I agree with you on the harmless error, not as much on the merits, Judge White. It was cumulative and they did both testify. So even if this Court were to find error, it would be harmless. What McCann told Suave is important because it shows what Suave knew when he made the decisions. He's making those decisions on behalf of Inland. So unless he hears from McCann what Bobby Ferguson is doing, he might not know that he needs to keep... Right, but what about the other way around? The other way around was Suave, I think there's one instance, if I'm right, where Suave told McCann, maybe there's two instances, Suave told McCann about the threats from Kilpatrick. McCann was the senior vice president, I think, at Suave Enterprises in charge with administering the Inland contract. She was the main point person from Suave Enterprises to Inland. So unless she knows what Suave learned from Kilpatrick, how would she know whether she has to work with Bobby Ferguson? One of the problems is, and I see your skepticism, but one of the problems is that when you have a corporation and the victim of extortion is a corporation, you're going to have these internal communications. Corporations, companies act through people. And so you're going to have one person communicating the threats to the other person who has to make those day-to-day decisions. That is what happened here. I will agree with you, Judge White, that some of what they said probably could have been taken as hearsay, and that's where the limiting instruction is important. But in any event, Suave testified to his conversations, right? Right. Okay, and then what about the amount of restitution? I mean, was it shown that this was an actual loss amount? Yes, that is what Judge Edmonds found, and that is reviewed only for clear error on appeal. And she found that these extortionate payments that DWC had to pay but they would not otherwise have had to pay were an overpayment. They were a loss because DWC, had this all been on the level, would not have made those extra payments. Well, was it established that it was all a pass-through, that everything that ended up with the defendants actually came from the sewer department as opposed to the contractors? I'm not sure I'm understanding your question, Judge White. Well, maybe I misunderstand, but the presumption is that the extra payments ultimately came out of the sewer department budget, right? That's right. Okay. But was that established as opposed to perhaps the contractors made less? That they made less profit than they otherwise might have? Yes, yes. I actually don't know the answer to that question, Judge White. I'm sorry. I can follow up with a letter on that point. I don't actually know if that's what she found or not what she found. I think the assumption was that there wouldn't be money coming from the contractors, that it was all coming from DWC. I do think that's the assumption, but I don't want to say for sure because I'm not entirely sure about that. I'd be happy to follow up if Your Honor would like. Okay. But was there evidence that the contract price would go up? I mean, from bid to actual execution? I don't think there was evidence in the form of, say, an expert witness. It's implied that public corruption in this way carries its own cost, not least of which is that the person who gets the contract is the one who's willing to pay off Bobby Ferguson and Kwame Kilpatrick, and so it's going to cost more than a competitive bidding process. I think that's the assumption Judge Edmonds was relying on. But there were no actual numbers? I don't believe so, no. Anything further? Not unless the Court has any questions. Further questions? Judge Seiler? Judge White? All right, thank you very much. Rebuttal? Five minutes. Thank you very much, Your Honor. I'd like to just briefly address the question on restitution. The argument I made is that the Court just simply adopted the same numbers that were determined as part of the sentencing process to represent gain for purposes of a guideline computation. With regard to the issue of prejudice, to the extent that there is evidence of it in the record, the government, neither in its response nor here today, has made any mention of the very plain evidence in the record that at the time of the hearing on August 14, the Court examined the request by Mr. Kilpatrick for a delay in the proceedings and found that it couldn't happen on the basis of the conflict information that had been presented that day because of the timing. And she said, Judge Edmonds said specifically, if this had been made six months earlier, maybe the things would be different. That six months had gone by without any notice to the Court. So one of the things that relates to, as in the language of Tyler and also Mickens, an adverse effect is counsel's failure during a critical stage of the proceedings and pretrial proceedings to bring to the attention of the Court this conflict situation so that it could be properly addressed in some fashion earlier than at the time that it was brought to the Court's attention. We're going to start talking about the time frame again. How do you respond to the government's contention that when Thomas and Naughton withdrew from the civil case in March of 2012, Kilpatrick was given notice of their motion to withdraw and was given a copy of the order allowing the withdrawal which specified this conflict? Your Honor, all I can say about it is that the record indicates that there was a proof of service, but there's no inquiry of Mr. Kilpatrick. No inquiry, no. I'm just saying he's provided those documents. We can go back and see what those documents say. I mean, are you disputing that those documents specify this conflict and that they were given to Kilpatrick in March? The document that government counsel referred to, Your Honor, I believe is the order from Judge Cleland that was issued in March, and there's a proof of service. There's no inquiry, there's no mention, there's no reference to that, is my point, in August when this matter was discussed before the Court. There's no inquiry whether or not Mr. Kilpatrick knew of the conflict, was aware of it. He didn't read the order? Is that what you're saying? I'm saying there's no evidence of it, Your Honor. I can't represent that he didn't read it. When the judge said, maybe if you would ask six months ago or something, did he respond or did anybody respond, well, we didn't know about it, he didn't know about it? There was no, as I recall the record, there was no inquiry to Mr. Kilpatrick on the 14th of August about this issue at all. There's no evidence that he did not know about it, and actually there's a presumption, I would think, that he's furnished an order that informs him of the conflict, and it's presumed that he received it and presumed that he read it, and he has not disputed it. I'm not disagreeing with you at all about that. Two other points. One is with regard to— Why did he not request that his attorneys withdraw from the criminal case in March when he was doing the same thing in the civil case? I mean, why did he allow them to continue until March, until August then? There's no answer to that in the record either. Judge Edmonds said, well, if it had been brought earlier, maybe I would have ruled differently, but you didn't do it. That's one of the reasons that sometimes defendants in this kind of situation would be appointed separate counsel so that they could have independent advice. The court asked earlier about hearing, and while I believe that a further hearing isn't necessary, I should point out, as we mentioned in our brief, that Wood v. Georgia is a case that came to the Supreme Court not on conflict issues but was remanded back to the state courts to pursue the conflict that the court found to be apparent in the record that the judge knew about but for which there was not a sufficient record. Finally, the case of Costey v. Dormier, as I've indicated in my responsive letter to the court, is one in which the nature of the conflict is entirely different than one that is an adverse interest. Complaining about an attorney in the office about whom somebody, the defendant, had filed a grievance previously is far removed from what the rules of professional conduct in Michigan define to be an adverse interest conflict that is almost never waivable. I think my time is essentially up. Thank you very much. Thank you. Five minutes rebuttal. Yes, sir. Van Dusen. First, I would like to refer back to what Mr. Goetz argued on behalf of the government, that the defendant somehow agreed that the agents could do what they did. As an individual who was part of that agreement and in point of fact reviewed the pages of the transcript to which the prosecutor invites the court to direct its attention, what I can tell this court is that we agreed that the agents absolutely could utilize their knowledge of the text messages to indicate nicknames, that they could identify if someone was called by a familiar term, i.e. a nickname in a text message, that their investigation determined in their review of the records determined that that individual was, for example, Bernard Kilpatrick. Under no circumstances did we agree that the agents could go so far beyond what was portrayed to us at the time would be proper and appropriate Rule 701 lay opinion testimony. Now, Your Honor asked me what the worst was. You've got to answer. Pardon? You've got to answer. Well, it's like asking me to pick which of my two sons I love the most. Then give us five. Give me the best two. Okay, thank you. Inviting the court's attention to the testimony of Agent Pascovitz on December 13th, found at page ID 100685. In your review of text messages, did you ever see Mayor Kilpatrick talking to other city contractors about holding up contracts that were going to be awarded by city agencies? Answer, no. In your review of Mayor Kilpatrick's text messages, did you see that he was talking about prices of city contracts that were under consideration for the award by the city with any other contractors besides Mr. Ferguson? No. And then there is massive objection. Court overruled all objections. It ended with the prosecutor asking the agent, in your review of the text messages for Mayor Kilpatrick, did you see him communicating with other city contractors in which they're discussing moving in on a particular piece of city business? Answer, no. What's so egregious about that? What is egregious about that is it falls precisely within the dangers of lay opinion testimony. Text messages are in evidence. Anybody can go through there and answer the same questions that this agent answered. Do the text messages, is there a reference in these text messages from Kilpatrick talking to Jim Johnson? Yes or no? Well, you can go through there and find out whether that's true or not. I mean, I don't see the harm here of him going, I went through them all, couldn't find Jim Johnson in here at all. Well, if that's wrong, I guess somebody else can review it and find out whether he's in it or not. It doesn't seem like it's harmful at all. Your Honor, we would submit that that is a precise reference to one of the dangers that's referenced in the Albertelli case where it says the witness may be drawing inferences that counsel could do but with advantages as to timing, repetition, and the imprimatur of testifying as a law enforcement officer. That that testimony may, and I quote, effectively smuggle in inadmissible evidence. That is hearsay, not within some exception, and perhaps inadmissible under the confrontation clause. But where is that evidence that was smuggled in? Counsel could not make an argument to the jury that says there are, you know, 100,000 messages and not one of them deals with another contractor besides Ferguson. Counsel can't do it because he hasn't read that. So he's asking a question of somebody who has culled through them. And it seems to me either the question is that the person's qualified as a fact witness because he or she has culled through them, something that you address on voir dire, did you really read all of them? Or you address on cross-examination, did you really read all of them? But I don't see, to me, that that's an easy one because somebody's being asked, having reviewed these, were there any that said this as opposed to, I mean, I thought that you were going to come up with something different where there's this sort of assertion that something means something and there's just no basis for it. Or there's an inference being drawn that something's being done for a purpose or, you know, the kinds of things that wouldn't be personal information based on review. I would invite Your Honor to examine the examples put forth in our brief, one of which in particular, and I don't pretend to be able to quote it verbatim, but what I can say is when Agent Paskevich was asked and you investigated whether African American city contractors were being pressured into providing work not providing for contracts for Mr. Ferguson, yes, he took her through a whole list. Was that for background purposes? Was that in the background part? I would not call that background, Your Honor. That was what the U.S. Attorney said it was. Was that what the court said it was? You're saying it was not the background. What it was was a definition of extortion of African American city contractors in the city of Detroit. We certainly didn't agree or argue that it was background and the court permitted it. And I don't recall, Your Honor, if the court gave a reason or just simply overruled our objection. Well, wasn't it a response to the defense that they were just trying to do this to promote minority subs so that they got their fair share? That was the government's response? No, no. I thought that was one of the defendant's arguments, that this was really just to make sure that the minority contractors got their fair share of the business. Am I wrong? Let me tell you, I was there through the trial. I'm not sure I really follow, Your Honor, but I think it's more me than it is you. In terms of what the government was intending to prove, I certainly can't speak to that. In terms of our defense that we put forward, we certainly argued that in point of fact, everybody was trying to get a leg up in Detroit. And the fact that it might be beneficial to your contractual opportunities to have Bobby Ferguson as one of your subcontractors was not the result of extortion. It's what was being done every day and every week in the context of the major contractors, all of whom were white-owned businesses, in order to get Detroit Water and Sewer Department contracts under Kwame Kilpatrick's administration. That's not extortion. That was just business. Thank you. Any further questions? Judge Simon? Judge White? All right. Thank you very much. Case will be submitted.